UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
JUAN RIVERA,                           :
                                       :
          Petitioner,                  :
                                       :
     - against –                       :
                                       :        No. 10 Civ. 8496 (JFK)
CALVIN WEST, Acting                    :        **Opinion and Order**
Superintendent, Elmira                 :
Correctional Facility,                 :
                                       :
          Respondent.                  :
-----------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: 8-18-11 _____     │
└─────────────────────────────────┘
```

<u>APPEARANCES</u>

> <u>FOR PETITIONER</u>:
>     Jeremy L. Gutman, Esq.

> <u>FOR RESPONDENT</u>:
>     Robert T. Johnson, District Attorney, Bronx County
>         Of Counsel:  Christopher J. Blira-Koessler, Esq.

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Juan Rivera's ("Rivera" or
"Petitioner") petition for a writ of habeas corpus, pursuant to
28 U.S.C. § 2254, on the basis of ineffective assistance of
counsel and prosecutorial misconduct.  For the reasons that
follow, the petition is denied.

## I. Background

Rivera was charged with Murder in the Second Degree,
Manslaughter in the First Degree, and Criminal Possession of a
Weapon in the Second Degree stemming from the October 1, 2002
fatal shooting of Leonardo Rivera (no relation to Petitioner) on
Longwood Avenue in the Bronx, New York.  (Tr. 27:15-18, 36:3-

1

11).[1]  Following a month-long trial, Rivera was convicted of

Second Degree Murder in New York Supreme Court, Bronx County, on

June 30, 2005.  <u>People v. Rivera</u>, 838 N.Y.S.2d 564 (N.Y. App.

Div. 2007).

## A. The Trial

In its case-in-chief, the government called several police

witnesses, a medical examiner, and two eye-witnesses:  Leslie

Bonilla, a lifelong friend of the victim, and Armando Vega, the

victim's brother.  Both Ms. Bonilla and Mr. Vega testified that

they were present at the scene of the crime and witnessed Rivera

shoot the victim multiple times while engaged in a dispute over

six hundred dollars.  (Tr. 319-25, 555-76).

Ms. Bonilla's testimony was problematic.  When asked on

direct examination by ADA Christine Scaccia how often she saw

Rivera, she replied, "Not too much.  When he came out of jail."

(Tr. 288:22-23).  After defense counsel objected, the court

struck the statement from the record and instructed the jury to

disregard it.  (Tr. 289:1-2).  A few minutes later, Ms. Bonilla

indicated that Rivera and the victim had been involved in a

dispute "about six hundred dollars Manny [Juan Rivera] owes

---

[1] Numerical references preceded by "Tr." refer to the trial
transcript.

Lenny for drugs."[2]   (Tr. 295:14-15).   Following Ms. Bonilla's

reference to Rivera's involvement with narcotics, defense

counsel moved for a mistrial.   (Tr. 298:14-17).   Defense counsel

did not suggest that the prosecutor "has done anything improper

with respect to not meeting her responsibility in instructing

the witness[,]" but noted that "[t]he witness . . . seems to

have an agenda all her own."   (Tr. 297:16-20).   Opposing the

motion for a mistrial, ADA Scaccia stated:

> Your Honor, first of all, counsel is right.   I did
> instruct the witness that, not because of anything she
> said here so far this morning wasn't true, but I told
> her there were certain rulings and certain things that
> could not be said in the courtroom.   We broke after
> the first two officers and I said, can I have ten
> minutes.   You told me to go down, while the jury is
> here, go down, get her and bring her up.   I didn't
> have a chance to speak with her this morning to remind
> her of my instructions.   That doesn't excuse what she
> did.   Obviously she doesn't understand.   She's not a
> professional witness.

(Tr. 299:2-14).   The court further inquired of ADA Scaccia:   "So

you had mentioned that, or things of that nature, to her not to

say," to which ADA Scaccia responded, "Yes."   (Tr. 300:10-12).

The trial judge then indicated that he was considering

either declaring a mistrial or striking Ms. Bonilla's testimony.

(Tr. 301:16-23).   After pondering the issue over a lunch break,

---

[2] Ms. Bonilla clarified in her testimony that Lenny (the victim)
owed Manny (Petitioner) six hundred dollars, not the other way
around.   (Tr. 319:17-18).   Mr. Vega confirmed this version of
the dispute.   (Tr. 562:12-21).

the trial judge noted that "really, there is no evidence at this point that the prosecution had anything to do with what the witness did or did not do intentionally or otherwise." (Tr. 306:22-24). During additional argument, ADA Scaccia explained:

> I instructed the witness that we were not going to talk about it. Over the break I asked her, I said, you know, remember I told you we are not going to talk about drugs. She said yes, but I got confused because you asked what the fight was about . . .

(Tr. 308:11-17). The court ultimately denied Rivera's motion for a mistrial and struck Ms. Bonilla's testimony regarding drugs from the record. (Tr. 318:7-13).

On cross-examination, defense counsel probed Ms. Bonilla to confirm ADA Scaccia's representations to the trial judge.

> Defense: So in preparing you to testify as a witness, you sat down with Ms. Scaccia. You sat down in her office and had a general discussion about testifying, correct?
>
> Witness: Wrong
>
> ....
>
> Witness: She didn't tell me nothing. She told me to come in; that's it.
>
> Defense: You got a call from Ms. Scaccia and she said come on in. That's it. And without a word, without a general explanation of what testifying entailed, without exploring with you your account, she just called you up and planted you right on the stand?
>
> Witness: Correct.
>
> Defense: Okay. So the first time Ms. Scaccia had asked you a series of questions about this event was three years later?

4

Witness:  I didn't even speak to her until --

Defense:  It's almost three years later?

Witness:  Yes.

Defense:   The first time Ms. Scaccia said to you,
"Tell us Ms. Bonilla, tell us what happened?" It was
on Thursday?

Witness:  Correct.

(Tr. 461:23 - 463:1).

The case went to the jury on May 4, 2005.  On May 10, 2005,

after requesting multiple read-backs of testimony and

deliberating for an aggregate of approximately five hours, the

jury sent a note to the court stating that it was unable to

reach a verdict as to the charge of Second Degree Murder.

(Pet'r Br. ¶ 29).  In response, the court instructed the jury:

> Let me remind you that your oath as jurors requires
> you to listen closely to the views of your fellow
> jurors, to consider their interpretation of evidence
> and to communicate your own views to them.  If we can
> aid you by reading any particular testimony which
> might resolve some factual issue, do not hesitate to
> request such evidence through your forelady.
>
> So ladies and gentlemen, due to the serious nature of
> the case for both sides, we would request that you try
> to come to a decision and continue your deliberations
> given that we've invested so much time, as well as us,
> [sic] in this particular case.  As a matter of fact,
> since April 4th.  So I would ask you to please
> continue your deliberations and go from there.  Thank
> you very much.

(Id.).  Defense counsel did not object to the court's

supplemental instruction.

Approximately two and one half hours later, the jury returned with a guilty verdict on the charge of Murder in the Second Degree.  (Id. ¶ 30).  On June 30, 2005, Rivera was sentenced to the maximum term of twenty-five years to life in prison.  Rivera, 838 N.Y.S.2d at 564.  He is currently incarcerated at the Elmira Correctional Facility in Elmira, New York.  (Pet'r Br. ¶ 4).

## B. The Appeal

Represented by new counsel, Rivera appealed his conviction to the Appellate Division, First Department, on the grounds that the verdict was against the weight of the evidence, the court improperly allowed the jury foreperson to signal when the read-back of testimony was complete, and the court's instruction to the deadlocked jury was unduly coercive.  (Declaration of Christopher J. Blira-Koessler ("Blira-Koessler Decl."), Ex. 1 at 2).  In an opinion dated June 28, 2007, the Appellate Division unanimously affirmed Rivera's conviction.  Rivera, 838 N.Y.S.2d at 564.  Of particular relevance to the present proceedings, the court ruled that the coercive jury instruction argument was "unpreserved and we decline to review it in the interest of justice.  Were we to review this claim, we would find no basis for reversal."  Id. at 565.  Leave to appeal to the New York Court of Appeals was denied on October 11, 2007.  People v. Rivera, 878 N.E.2d 616 (N.Y. 2007).

6

## C. The Motion to Vacate

Thereafter, Rivera filed a motion to vacate his murder conviction pursuant to N.Y. C.P.L.R. 440.10 in New York Supreme Court (the "440 Court") on the following grounds: (1) ineffective assistance of counsel due to his attorney's failure to pursue exculpatory evidence and object to the trial court's supplemental jury instruction; (2) failure of the prosecutor to correct testimony she knew to be false; and (3) newly discovered evidence.  (Blira-Koessler Decl., Ex. 3).

Along with Respondent's Memorandum of Law in Opposition to Defendant's Motion to Vacate the Judgment, the trial prosecutor submitted an affirmation dated April 2009 which addressed the allegation that she had failed to correct testimony that Ms. Bonilla and the ADA did not have a general discussion about testifying prior to trial.  ADA Scaccia explained:

> I did not correct this testimony because it was the truth.  I experienced difficulty getting in touch with Ms. Bonilla prior to trial, and was only able to procure her as a witness at the last minute. Therefore, I did not have a chance to meet with her and go over her testimony or have a "general discussion about testifying."

(Blira-Koessler Decl., Ex. 4).

The defense responded by amending its grounds for vacatur, arguing that if ADA Scaccia's affirmation was true, and Ms. Bonilla had not testified falsely when she stated that she had not met or discussed her testimony with ADA Scaccia prior to

7

taking the stand, then the affirmation squarely contradicted ADA
Scaccia's statements to the trial court in opposition to the
motion for a mistrial.  (Blira-Koessler Decl., Ex. 5 at 12).
The gravamen of the allegation was that some misrepresentation
had taken place – ADA Scaccia either lied in her affirmation
when she stated that she had not had a general discussion about
testifying with Ms. Bonilla prior to her taking the stand, or
she lied to the court when she said that she "did instruct the
witness that . . . there were certain rulings and certain things
that could not be said in the courtroom."  (Tr. 299:3-7).
Either way, the defense suggested, the prosecutor's conduct
denied Rivera of his Fourteenth Amendment right to due process.

In an interim decision dated September 3, 2009, the 440
Court found no evidence to support Rivera's allegations of
prosecutorial misconduct:

> I find defendant's contention regarding alleged
> perjurious testimony knowingly procured by the People
> and defendant's related contentions regarding alleged
> misrepresentations by the prosecutor to the trial
> court to rest in the first instance, on speculation
> and indeed, to be refuted by the affidavit by the
> trial assistant . . . .  Insofar as defendant argues,
> in his Reply Memorandum of Law, that
> representations to the court by the assistant
> district attorney at trial reveal that the
> assistant did speak to the witness prior to that
> witness's testimony and are therefore, inconsistent
> with the witnesses testimony at trial and inconsistent
> with the assistant's April, 2009 affirmation, or
> otherwise were misrepresentations to the court, I
> find to the contrary.  Reference to the trial record
> of the questions on cross-examination which defendant

8

contends the People's witness answered falsely,
reveals that the context and thrust of those questions
concerned whether the witness had had a "general
discussion" with the trial assistant about testifying,
prior to testifying or whether the assistant had
explored with the witness her "account" or otherwise,
pursued "a general explanation of what testifying
entailed" prior to the witness taking the stand at
trial. The witness's answers, at trial, to these
questions, were to the effect that the first time she
had been asked by the assistant about "what happened"
was almost three years after the  shooting,    "on
Thursday."   I find that the representations by the
assistant to the court at trial regarding instructions
to the witness not to broach certain areas in her
testimony at trial are neither inconsistent with the
witness's testimony at trial or with that same
assistant's affidavit.   Contrary to the defendant's
argument, the assistant's representations to the trial
court when it was considering a sanction or other
remedy because of prejudicial and irrelevant remarks
by the witness on the stand, did not concern
discussions with the witness about what had happened
at the time of the shooting but rather were directions
by the assistant to the witness – consistent with
rulings by the trial court – not to discuss certain
matters such as defendant's prior incarceration.
Accordingly, I find no support in the record for the
conclusion that the witness in question gave false
testimony at trial or that the prosecutor engaged in
any misconduct either on or off the record.

(Blira-Koessler Decl., Ex. 6 at 4-6).

The 440 Court also rejected that portion of the ineffective

assistance of counsel claim relating to the supplemental jury

instruction on the basis of the Appellate Division's comment in

dicta that "were we to review this claim, we would find no basis

for reversal." (Id. at 4).[3]  Leave to appeal the denial of his

_____

[3] A final decision dated July 15, 2010 resolved the § 440.10
motion in its entirety.  See Blira-Koessler Decl., Ex. 7.

C.P.L.R. 440.10 motion to the Appellate Division, First

Department was denied on November 9, 2010.  People v. Rivera,

2010 NY Slip Op 87401(U) (Nov. 9, 2010).

## II. Discussion

Having exhausted all opportunities for relief under New

York law, on November 10, 2010, Rivera filed a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner

argues that the September 3, 2009 decision by the 440 Court was

contrary to and an unreasonable application of federal law

governing effective assistance of counsel and prosecutorial

misconduct claims.

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), 28 U.S.C. § 2254, the standard by which a

federal court reviews a habeas petition "depends on whether the

petitioner's claims have previously been 'adjudicated on the

merits' by a state court."  Spears v. Greiner, 459 F.3d 200, 203

(2d Cir. 2006) (quoting 28 U.S.C. § 2254(d)).  A state court

ruling is adjudicated on the merits if it announces itself as

such and "reduces its disposition to judgment."  Shabazz v.

Artuz, 336 F.3d 154, 160 (2d Cir. 2003).  In evaluating whether

or not a state court decision is merits-based, a federal court

should consider:  "(1) the state court's opinion, (2) whether

the state court was aware of a procedural bar, and (3) the

practice of state courts in similar circumstances." Spears, 459 F.3d at 203.  Based on these factors, "a federal habeas court in this circuit should . . . classify the decision as either:  (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law or (2) fairly appearing to rest primarily on state procedural law." Jimenez v. Walker, 458 F.3d 130, 145 (2d Cir. 2006).  If the state court decision fairly appears to rest primarily on federal law and does not include a "clear and express statement of reliance on a state procedural bar," the habeas court treats the state court ruling as an adjudication on the merits.  Id.

Where a claim has been resolved on the merits in state court, a federal court may only grant a habeas petition if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Thus, this Court's review of a state court adjudication on the merits is "highly deferential." Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006).  However, where a claim has not been heard on the merits, a federal court need not defer to the state court ruling, and may review findings of fact and conclusions of law de novo.  Spears, 459 F.3d at 203.

11

## B. Ineffective Assistance of Counsel

Referring to the Appellate Division's comment that "were we to review" the unpreserved challenge to the supplemental jury charge "we would find no error," the 440 Court held that there was "no basis for concluding defense counsel's failure to object to the court's instructions was such as to deprive defendant of his right to the effective assistance of counsel." (Blira-Koessler Decl., Ex. 6 at 4).  Where the state court declines to hear a claim on the merits because it is procedurally barred, any language as to how it would have ruled had it reviewed the claim "does not establish a merits consideration." Fong v. Poole, 522 F. Supp. 2d 642, 656 (S.D.N.Y. 2007).  Thus, the Appellate Division's musing about how it would have ruled had Petitioner's substantive challenge to the supplemental jury charge been preserved is not an adjudication on the merits. Petitioner now argues that the state court's dismissal of his ineffective assistance of counsel claim cannot be considered an adjudication on the merits because it relied on a non-merits adjudication by the Appellate Division.

This Court does not agree.  When determining the appropriate standard of review, the habeas court focuses on whether the state court decision rests primarily on federal law or on a state procedural bar.  Neither the State's opposition to the motion nor the 440 Court's September 3, 2009 decision

mention the existence of a procedural bar to Petitioner's
ineffective assistance of counsel claim.  The 440 Court
considered the substance of Petitioner's claim, rejected it, and
reduced its decision to a judgment.  The fact that the 440
Court's rejection of Petitioner's ineffective assistance of
counsel claim contains little analysis and relies on dicta from
the Appellate Division is of no moment.  See Sellan v. Kuhlman,
261 F.3d 303, 312 (2d Cir. 2001) ("For the purposes of AEDPA
deference, a state court 'adjudicate[s]' a state prisoner's
federal claim on the merits when it (1) disposes of the claim
'on the merits,' and (2) reduces its disposition to judgment.
When a state court does so, a federal habeas court must defer in
the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state
court's decision on the federal claim - even if the state court
does not explicitly refer to either the federal claim or to
relevant federal case law.").  Thus, the Court reviews this
claim with AEDPA deference.

     "An ineffective assistance claim asserted in a habeas
petition is analyzed under the 'unreasonable application' clause
of AEDPA because it is past question that the rule set forth in
Strickland qualifies as clearly established Federal law, as
determined by the Supreme Court of the United States." Lynn v.
Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (internal citation
omitted).  The relevant question is "not whether the state court

13

was incorrect or erroneous in rejecting [an] ineffective assistance claim, but whether it was 'objectively unreasonable' in doing so." Sellan, 261 F.3d at 315.  A finding that the state court's application of federal law is "objectively unreasonable" requires "some increment of incorrectness beyond error."  Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003).

In order to prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that: (1) counsel performed deficiently at trial, and (2) that deficient performance caused prejudice to the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  The deficiency must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and must "deprive the defendant of a fair trial."  Id.  An attorney's effectiveness should be measured by a standard of "reasonableness under prevailing professional norms."  Id. at 688.  "Judicial scrutiny of counsel's performance must be highly deferential . . . [as] it is all too easy for a court, examining a counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Id. at 689.

Petitioner's ineffective assistance of counsel claim necessarily depends on the propriety of the supplemental jury charge.  "Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body."  Lowenfield v.

14

Phelps, 484 U.S. 231, 241 (1988). Where a jury communicates to the court after a period of deliberation that it is unable to reach a verdict, the Supreme Court has approved of the use of supplemental jury instructions – known as an Allen charge after Allen v. United States, 164 U.S. 492 (1896) – "urging a [deadlocked jury] to continue deliberating and for the jurors in the minority to listen to the majority's arguments and ask themselves whether their own views were reasonable under the circumstances." Spears, 459 F.3d at 204. Such an instruction carries the potential of interfering with "the integrity of the individual conscience in the jury deliberation process." Smalls v. Batista, 191 F.3d 272, 279 (2d Cir. 1999). As a result, Allen charges should generally be accompanied by cautionary language emphasizing that "the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows." Allen, 164 U.S. at 501; see Spears, 459 F.3d at 205. "[A]n Allen charge is inherently coercive if it both: '(1) obligated the jurors to convince one another that one view was superior to another, and (2) failed to remind those jurors not to relinquish their own conscientiously held beliefs." Fong, 522 F. Supp. 2d at 659 (quoting Smalls, 191 F.3d at 278).

However, there is no per se rule that a supplemental charge to a deadlocked jury without accompanying cautionary language is

coercive.  Spears, 459 F.3d at 206.  The Court in Spears reiterated that each supplemental instruction "must be evaluated in its context and all the circumstances."  Id. (quoting Lowenfield, 484 U.S. at 237).  Thus, beyond the language of the charge, courts consider factors such as the amount of time that elapsed between the supplemental charge and the jury's verdict, and defense counsel's objections – or lack thereof – to the supplemental charge.  See Lowenfield, 484 U.S. at 240; Spears, 459 F.3d at 206-07.

The 440 Court held that, since the Appellate Division noted no grounds for reversal in the supplemental jury charge, counsel could not be faulted for failing to make a meritless objection to the charge.  This Court defers to that ruling, particularly as there is nothing objectively unreasonable about the 440 Court's conclusion.  The trial court's supplemental jury charge lacks the hallmark feature of an Allen charge in that it did not direct any juror to reexamine his or her own beliefs.  See Spears, 459 F.3d at 204 ("[A] 'judge's simple request that the jury continue deliberations, especially when unaware of the composition of the jury's nascent verdict' can not be 'properly considered an Allen charge.'" (citing United States v. Prosperi, 201 F.3d 1335, 1341 (11th Cir. 2000))).  Unlike the trial court in Smalls, which directed each juror to "convince the others of the correctness of your views," 191 F.3d at 275, the trial court

16

here merely asked the jurors to continue deliberating, "consider" the opinions of their fellow jurors, and "try" to reach a verdict. (Tr. 1276). The court did not suggest that the jurors attempt to persuade each other or bow to pressure from others, but reminded them that their oath as jurors required that they "communicate" with one another. See United States v. Henry, 325 F.3d 93, 107 (2d Cir. 2003) ("The mere fact that the district court reminded the jurors of their oaths and responsibility to deliberate and attempt to render a true verdict does not render the charge coercive."). The trial court even offered the jurors additional read-backs of testimony – even though read-backs had already consumed most of five days – in order to "aid" these communications. Nowhere in the supplemental instruction did the court suggest that jurors reconsider their beliefs for the sake of a verdict. Finally, the court's reference to the amount of time all parties had invested in the trial is not inherently coercive. See id. (finding no error in trial court's statement that "this has been a fairly long trial, about three weeks, and at some considerable expense and money and human effort"). Indeed, in many respects, the trial court's supplemental charge is similar to the charge in Spears, which the Court of Appeals found to satisfy due process. Spears, 459 F.3d at 206.

17

The Court also looks to indicators of coercion outside the language of the instruction itself.  Petitioner contends that the deadlocked jury's brief deliberation after receiving the supplemental instruction suggests coercion.  The jury deliberated for approximately two and one half hours after receiving the supplemental charge.  This is significantly longer than the thirty minutes the court in Fong found as indicative of coercion.  See Fong, 522 F. Supp. 2d at 662-63.  Moreover, although the jury had had the case for several days, prior to the instruction it had only deliberated for a cumulative five hours.  Two and one half hours is a significant portion of the jury's overall deliberation time and, when viewed in context, cannot be considered brief.  See Texidor v. Artus, No. 06 Civ. 7173, 2007 WL 1982271, at *6 (S.D.N.Y. July 10, 2007) (holding that a jury's post-supplemental instruction deliberation period of two and one half hours was not reflective of coercion where the jury had deliberated for four hours prior to the supplemental charge); United States v. Crispo, 306 F.3d 71, 77 (2d Cir. 2002) (the fact that "the jury did not return a verdict immediately after the Allen charge was reread at 10:25 a.m. but returned its verdict some time after lunch . . . suggests that the charge was no so coercive as to end all reasoned discussion").

18

In light of all facts and circumstances, the trial court's mildly worded supplemental jury instruction was not unconstitutionally coercive, and it follows that counsel's failure to object to the charge was reasonable.  As this Court finds nothing objectively unreasonable in the 440 Court's rejection of Petitioner's ineffective assistance of counsel claim, that ruling is not an unreasonable application of Strickland.

### C. Prosecutorial Misconduct

The State Supreme Court rejected Petitioner's prosecutorial misconduct claim because the trial record contained no evidence that the prosecutor had either suborned perjury or made misrepresentations to the court.  Petitioner argues that the state court's finding that the trial prosecutor did not engage in misconduct was unreasonable in light of the evidence, and, as a result, the denial of his motion for vacatur was an unreasonable application of clearly established federal due process law vacating convictions obtained through false evidence.  See Napue v. Illinois, 360 U.S. 264, 269 (1959) ("A conviction obtained through false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."); Alcorta v. Texas, 355 U.S. 28 (1957) (per curiam) (due process is violated where the state solicits or fails to correct false testimony).

19

The state court adjudicated the prosecutorial misconduct claim on the merits, examining the trial record and making substantive factual findings.  Therefore, its ruling is entitled to deference on collateral review.  This Court will review the state court's factual findings "only to determine whether they were unreasonable in light of the evidence presented, 28 U.S.C. § 2254(d)(2), or whether the presumption that they are correct was rebutted by 'clear and convincing' evidence, 28 U.S.C. § 2254(e)(1)."  Channer v. Brooks, 320 F.3d 188, 195 (2d Cir. 2003).

Petitioner asserts that the 440 Court's factual findings were unreasonable because a statement by the prosecutor to the trial court hearing the motion for a mistrial "cannot be reconciled" with her 2009 affirmation.  Specifically, Petitioner argues that ADA Scaccia's 2009 affirmation, in which she states that she "did not have a chance to meet with [Ms. Bonilla] and go over her testimony or have a 'general discussion about testifying[,]'" is at odds with a statement she made to the trial court in opposition to Rivera's motion for a mistrial, that she "did instruct the witness that . . . there were certain . . . things that could not be said in the courtroom." (Blira-Koessler Decl., Ex. 4; Tr. 299:3-7).

Petitioner believes the prosecutor's statement to the trial court that "I didn't have a chance to speak with [Ms. Bonilla]

this morning to remind her of my instructions[,]" proves that
Ms. Bonilla lied on cross-examination when she denied having a
general discussion about testifying with the prosecutor.
Petitioner suggests that if ADA Scaccia needed to "remind" the
witness about her instructions the morning of her testimony,
then the instructions must have been given at some point before
trial.  Based on this statement, Petitioner concludes that it is
"beyond question that the prosecutor told the Court that she had
spoken with the witness in advance of her testimony." (Pet'r.
Br. ¶ 43).

     Petitioner's theory is not the "clear and convincing
evidence" necessary to overcome the presumption of correctness
afforded the 440 Court's findings.  The prosecutor's use of the
word "remind" was merely the type of imprecise language often
encountered in extemporaneous speaking.  As the 440 Court
concluded, a review of the trial record reveals that the
prosecutor never told the trial judge that she had prepared the
witness to testify prior to trial.  ADA Scaccia's representation
to the trial court was that on the day of Ms. Bonilla's
testimony, she briefly discussed with the witness "certain
rulings and certain things that could not be said in the
courtroom" – a conversation different from the pre-trial
"general discussion about testifying" that ADA Scaccia and Ms.
Bonilla agree never happened.  As such, the 440 Court's finding

21

of no inconsistency between the prosecutor's statement in
opposition to the mistrial and either her later affirmation or
Ms. Bonilla's testimony was reasonable in light of all the
evidence.  Consequently, the denial of the motion for vacatur
was not contrary to or an unreasonable application of the
clearly established federal law announced in <u>Napue</u> and <u>Alcorta</u>.

### III. Conclusion

Because the trial court's supplemental instruction to the jury was not coercive, Petitioner cannot demonstrate that his counsel's failure to object to the instruction violated his Sixth Amendment rights.  Additionally, Petitioner has put forth insufficient evidence to rebut the presumption of correctness afforded the state court's findings relative to allegations of prosecutorial misconduct.  The § 2254 petition is denied.  This Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).  As the petition makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue.  28 U.S.C. § 2253.  The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:   New York, New York
         August 18, 2011

John F. Keenan
United States District Judge